35 C.C.P.A.(Patents)

MINNESOTA MINING & MANUFACTUR-
ING CO. v. McDONNELL.

Patent Appeal No. 5309.

Court of Customs and Patent Appeals.

June 17, 1947.

Rehearing Denied Sept. 29, 1947.

Harold J. Kinney, of St. Paul, Minn. (Carpenter, Abbott, Coulter & Kinney, of St. Paul, Minn., of counsel), for appellant.

Brown, Jackson, Boettcher & Dienner, of Chicago, Ill. (John A. Dienner and Edward C. Grelle, both of Chicago, Ill., of counsel), for appellee.

Before BLAND, Acting Presiding Judge, and HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

JACKSON, Associate Judge.

This is an appeal in a trade-mark opposition proceeding from a decision, 67 U.S.P.Q. 173, of the Commissioner of Patents, by Leslie Frazer, First Assistant Commissioner, affirming that of the Examiner of Interferences dismissing appellant's notice of opposition and adjudging that appellee is entitled to the registration for which he made application.

The application, Serial No. 452,310, was filed April 13, 1942, and alleged January 19, 1939, as the date of first use of appellee's mark, consisting of "MM" joined together above a chevron-like angular line, the ends of which connect with the outer legs of the letters. The mark is applied to "snap switches."

The application was tentatively allowed and the mark was published in the Official Gazette of March 16, 1943.

The notice of opposition, dated April 12, 1943, relates to the confusion-in-trade clause of section 5 of the Trade-Mark Act of 1905, 15 U.S.C.A. § 85.

In the notice of opposition it was alleged that for a long time appellant has been a well-known manufacturer of many products, among which are electrical supplies, including electrical insulating tape and non-insulating pressure-sensitive adhesive tape, employed in industrial work, including electrical work, and that it manufactured and sold such articles since long prior to January 19, 1939.

Appellant relied on eight registered trade-marks, alleging use of said marks prior to January 19, 1939, as follows: "3M Co." for corundum, garnet and emery paper and cloth; "Tri-M-Ite" for abrasive paper and cloth; "Three-M" for abrasive cloth and paper; "3-M" for polishing wax for furniture, woodwork, linoleum, rubber or asphalt tiles, and lacquer polishes for automobile finishes; "3-M" for adhesives, adhesive tape, adhesive sheet and fabric material, cement, elastic cement, weatherstrip cement and rubber cement; and "3-M" for quartz, quartzite, digester, filter and sandpaper quartz, aggregate, plaster, gravel, sand, sand filler, silica flour, silica, bird, pigeon and chick grit, run of quarry, garnet, corundum and roofing granules.

On August 13, 1943, four months subsequent to the filing of the notice of opposition, appellant applied for registration of

the expression "3-M" as a trade-mark, alleging use of said mark on electrical tape to have been continuous since at least May 1933. The application was granted and the mark was registered on January 11, 1944.

Both parties took testimony and several exhibits were received in evidence.

The testimony on behalf of appellant began on August 17, 1943, and was completed on August 18, 1943. The testimony on behalf of appellee was given and completed on March 17, 1944.

It may be observed that the application for appellant's trade-mark, as applied to electrical tape, was filed only four days prior to the taking of testimony on its behalf and that the registration of such mark had been granted two months prior to the taking of testimony on behalf of appellee.

It appears that appellant is a Delaware Corporation with its principal place of business at St. Paul, Minnesota, and that it manufactures a great variety of articles.

Appellee is an individual, doing business in Chicago, Illinois, under the trade-name of McDonnell and Miller, formerly a partnership, and is engaged in manufacturing and selling internationally, feed water regulators, liquid level controllers, low-water controllers, snap action humidifier valves, and snap switches.

Appellant sells its products to supply houses, hardware jobbers, paint jobbers, lacquer specialist jobbers, janitor supply jobbers, and others who are in business to serve the trade with products of the type sold by appellant. Appellee sells to boiler manufacturers, wholesalers of pumping and heating supplies, heating and plumbing contractors, stoker manufacturers, oil burner manufacturers, gas burner manufacturers, and equipment manufacturers.

Since January 1939, appellee has supplied snap switches, to which were applied the involved mark, to equipment manufacturers who engineer such switches into their equipment. He supplies equipment manufacturers with specifications of snap switches from which the manufacturer selects the type required and orders it pursuant to specification. It appears those switches must be provided with special tappings and holding blocks. They are not sold to the hardware trade, nor resold as such by equipment manufacturers.

Following what appears to be his standard practice of applying his trade-mark to all his products, appellee has applied the involved mark to custom built snap switches.

The record on behalf of appellant proves without contradiction that it has used the registered marks pleaded in the notice of opposition as alleged and the first use thereof as applied to the articles to which they are affixed is prior to January 19, 1939.

Appellant contended below and contends here that its abrasives, cements, sand paper, tapes, polishes, and so forth, are goods of the same descriptive properties as snap switches for the reason that all those kinds of goods are sold in hardware stores. Of course, the application of appellee applies to snap switches in general, but the snap switches he has made and sold are not at the present time sold in the hardware trade. However, there can be no question, in our opinion, that such snap switches could be made and sold in the same stores as the goods of appellant if appellee so desired.

The examiner noted the principle that when goods of contending parties are sold in the same stores, it is a matter to be considered in connection with the descriptive properties of the goods, but is not controlling on that question, citing Pratt & Lambert, Inc., v. Chapman & Rodgers, Inc., 136 F.2d 909, 30 C.C.P.A., Patents, 1228; and Kraft-Phenix Cheese Corp. v. Consolidated Beverages, Ltd., 107 F.2d 1004, 27 C.C.P.A., Patents, 803.

The examiner held, and in our opinion properly so, that although the goods to which appellant's registered trademarks are applied, as pleaded in the notice of opposition, and snap switches, even though all are sold in hardware stores, are so distinct and dissimilar in their uses and essential characteristics as to be unlikely to cause purchasers to assume that they had a common origin. He observed, and we agree with the observation, that there are sold in hardware stores an almost unlimited variety of unrelated items and that

because of the differences between snap switches and appellant's products, they do not possess the same descriptive properties.

■ The commissioner held that the goods named in the registrations pleaded in the notice of opposition were obviously not of the same descriptive properties as appellee's goods and, consequently, the claim of similarity of appellee's mark to the marks under which appellant sold its goods becomes immaterial. General Mills, Inc., v. Freed, 89 F.2d 664, 24 C.C.P.A., Patents, 1171.

■ Appellant's registration of the mark "3-M" for electrical tape, dated January 11, 1944, heretofore referred to, was introduced in evidence as a cross-exhibit of appellant during the cross-examination of appellee. The application for that mark, filed only four days prior to the taking of appellant's testimony, was not referred to therein, nor was there any evidence introduced by appellant to substantiate the statement in the application that the mark, as applied to electrical tape, was in continuous use since at least May 1933.

There is no testimony of any kind or character that appellant applied its mark to electrical tape prior to January 1939, which date of first use by appellee appears in the record without contradiction in his testimony.

The statement appearing in appellant's registration for its "3-M" mark, as applied to electrical tape, was signed by its president. Testimony on its behalf was offered by its vice-president, a sales manager, the sales manager of the coated abrasive products, the chief photographic laboratory technician and the general sales manager of the "Scotch" Tape Division, all officers or employees of appellant. Not one of those witnesses was asked the direct question as to when the "3-M" trademark, as applied to electrical tape, was first used. Neither does it appear that any electrical tape was manufactured and sold by appellant prior to January 1939. Other witnesses, hardware store proprietors and the like, appeared on behalf of appellant to testify as to the likelihood of confusion of origin in the use of the marks of the parties on electrical tape and snap switches.

The general sales manager of the "Scotch" Tape Division of appellant, who, it would seem, should be expected to know most about the electrical tape product, stated that appellant had manufactured and sold tapes since 1930. That statement is not sufficient to prove the earliest date of appellant's sale of electrical tape.

The vice-president testified in some detail as to the various products sold and manufactured by his company and when asked on direct examination what products of appellant were sold prior to January 1, 1939, prefaced his answer by stating, "The products made and sold previous to the entrance of our country in the so-called World War 2 * * *." Clearly the witness, a high official of the company, presumably knowing that an application was filed to register the trade-mark "3-M," as applied to electrical tape, only four days prior to the date on which he testified, should have answered such a question squarely that the date of first use of the mark, so far as electrical tape was concerned, was prior to January 1939, if such were the fact. In any event, if the witness knew, and he should have known, that that mark on electrical tape had been used prior to that date, he would have so stated rather than have fixed the indefinite time of first use as being prior to our entrance into World War 2. Our involvement in that war was almost three years after appellee's first use of his trade-mark for snap switches.

Apparently in an attempt to make more definite the testimony of the vice-president, instead of asking him whether or not electrical tapes were sold prior to January 1939 with the trade-mark "3-M" applied thereto, the following questions were asked by appellant's counsel and the following answers made thereto:

"Q. I believe the testimony began on the basis that you were going to name the products that were made and/or sold by the company prior to January 1, 1939. I believe you might have mentioned one product there that wasn't made and sold prior to that time, during the latter part of your

testimony, although I am not sure of that? A. I would like to correct part of my testimony. In the last items I referred to a product known as 'Scotch' abrasive grits which wasn't sold previous to 1939.

"Q. Was sulphuric acid sold prior to that time, Mr. Bush? A. I would like to make another correction. Sulphuric acid wasn't sold until February, 1942."

Appellant contends that because the witness did not state in the answers that electrical tape was one of the products not made by appellant prior to January 1, 1939, that his testimony should be interpreted to mean that the trade-mark "3-M," as applied to electrical tape, was used by appellant prior to that date. However, the witness's answer was not based on products made by his company prior to January 1939, but on products made prior to the entrance of the United States into World War 2.

Appellant had the burden of establishing priority in the use of its mark by a fair preponderance of the evidence and we agree with the Examiner of Interferences and the Commissioner of Patents that it failed to sustain that burden.

The Examiner of Interferences was of opinion that opposer's electrical tape did not possess the same descriptive properties as appellee's snap switches, but in view of what has been said and our conclusion, it is not necessary to discuss that holding in detail.

The commissioner in his decision stated that appellant complained because the examiner had made no ruling as to the alleged similarity of the marks and stated that such ruling was unnecessary in the view the examiner took of the case and that it was unnecessary for the commissioner to make any such ruling. He then went on to state: "It seems proper to say, however, that in my opinion applicant's mark bears too near a resemblance to opposer's "3-M" mark to be registered for merchandise of the same descriptive properties, had opposer established priority of use in connection with such merchandise."

Appellant filed a petition for reconsideration and in a subsequent decision, 67 USPQ 310, the commissioner reiterated his holding that appellant had failed to establish the sale of electrical tape under the trade-mark "3-M", as of a date prior to appellee's first use of his mark upon snap switches.

The commissioner stated that appellant seemed to assume that had he been satisfied that appellant had shown prior use of its mark with respect to electrical tape he would have sustained the opposition. The commissioner stated that such was not his position, saying "Aside from the fact that it is a pressure-sensitive adhesive tape, the record is entirely silent as to the character of this product or its intended function."

He stated he was not at liberty to take judicial notice as a matter of common knowledge of the probable purpose of the article merely from its name, citing Lever Brothers Company v. Butler Manufacturing Company, 88 F.2d 842, 24 C.C.P.A., Patents, 1000. In this connection the commissioner held that if the expression "electrical tape" had a well-understood meaning in the trade, it was a fact to be proved and that upon the record he was not prepared to hold that electrical tape and snap switches are merchandise possessing the same descriptive properties. He then reiterated that in his opinion opposer failed to establish its sale of electrical tape under the "3-M" trade-mark as of a date earlier than appellee's first use of his mark on snap switches.

Appellant contends that its registration of the "3-M" mark applied to electrical tape is sufficient in and of itself to sustain the opposition. In support of that contention the case of Island Road Bottling Company v. Drink-Mor Beverage Company, 140 F.2d 331, 31 C.C.P.A., Patents, 816, is cited. The commissioner held such registration to be "of no avail to opposer" in this proceeding, citing McKesson & Robbins, Inc., v. Cameo Corporation, 557 O.G. 596, 59 U.S. P.Q. 399. He held the Island Road Bottling Company case, supra, to be not in point, stating that in that case the notice of opposition had been dismissed and the application for registration rejected ex parte in view of the opposer's registration of a mark which apparently had been abandoned. He said the court in that case

merely held that the validity of the registration was not subject to collateral attack. He then noted that the same would be true of any registration cited against any application in an ex parte proceeding, although no application was rejectable upon a registration showing on its face a later filing date than that of the involved application. He then stated in such a situation an interference might be declared or the registrant might oppose the application, but that in neither case, under the express provision of section 7 of the Trade-Mark Act of February 20, 1905, 15 U.S.C.A. § 87, would the application be refused, unless it appeared that the registrant was "the person first to adopt and use the mark." He then properly pointed out that the rejectability of appellee's mark on appellant's registration to be entirely an ex parte question and a matter upon which appellant was not entitled to be heard, citing Island Road Bottling Co. v. Drink-Mor Beverage Co., 132 F.2d 129, 30 C.C.P.A., Patents, 708.

The record here clearly shows that appellant did not sustain its burden of proving priority of use. of its "3-M" mark on electrical tape prior to the use of his mark in January 1939 by appellee, although it had ample opportunity to do so, if such were the fact. The presumption arising from its registration surely cannot be properly held to be of greater weight than actual proof of prior use by appellee.

■ There is no attempt, in this case, by appellee to attack the validity of appellant's registered mark "3-M" as applied to electrical tape, as contended by appellant. Appellant sought the opposition; pleaded the use of eight registered marks on goods none of which, in our opinion, possesses the same descriptive properties as snap switches; did not and could not have pleaded in its notice of opposition its registered mark as applied to electrical tape; and with knowledge of having filed its application for that registration only four days prior to the taking of testimony on its behalf, no mention of such fact was brought out until March 17, 1944, during the cross-examination of appellee, when the registration was received in evidence as a cross-exhibit of appellant. Under the circumstances of this case that registration is entirely irrelevant.

■ It appears that dealers in appellant's products refer to them as "3-M" products as a kind of shortened form for its corporate name. Such expression, however, is not the corporate name of appellant and it cannot be held that appellee has, as contended by appellant, appropriated such corporate name.

■ Since appellee is the prior user, the similarity of the marks and the descriptive properties of the goods of the parties are immaterial.

■ Because we are of opinion that the record clearly shows appellee used his mark on snap switches prior to any date proved by appellant the decision of the commissioner affirming that of the Examiner of Interferences, dismissing the notice of opposition and adjudging that appellee is entitled to the registration for which he has made application, is without error.

The decision appealed from is affirmed.

Affirmed.

By reason of illness, GARRETT, Presiding Judge, was not present at the argument of this case and did not participate in the decision.